UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| JOHN G. PEELER, | : | NO. 1:06-CV-317 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **OPINION AND ORDER** |
| | : | |
| | : | |
| CERIDIAN CORPORATION, | : | |
| | : | |
| Defendant. | : | |

This matter is before the Court on Defendant's Motion for Summary Judgment (doc. 15), Plaintiff's Response (doc. 16), and Defendant's Reply (doc. 17).  For the reasons indicated herein, the Court DENIES Defendant's Motion.

**I.  BACKGROUND**

Defendant Ceridian Corporation (hereinafter "Ceridian") is a human resources company with a sales and training office in Cincinnati (doc. 15).  Defendant employed Plaintiff John G. Peeler in a variety of positions from 1988 until his termination in 2005 (<u>Id</u>.).  Plaintiff alleges his termination constitutes a violation of the Age Discrimination in Employment Act (ADEA) (doc. 1).  The facts are as follows.

In 1997, Defendant offered and Plaintiff accepted a position as an account representative in Defendant's sales department (<u>Id</u>.).  As an account representative, Plaintiff was responsible for selling Ceridian's products and services to existing customers and was required to reach a mandatory sales

quota (Id.).  In 2001, Ceridian reorganized the sales department and eliminated the position of account representative (Id.). Defendant gave Plaintiff the choice of transferring to the position of "relationship manager" or "major account representative" (hereinafter "MAR") (Id.).  The positions differed in job requirements (Id.).  The relationship manager position required the maintenance of relationships with existing customers and carried no mandatory sales quota, while the MAR position required the cultivation of relationships with new customers and carried a mandatory sales quota (Id.).  Plaintiff chose to transfer to the MAR position, increasing his base salary by $20,000 (Id.).

In June 2001, Steve Collins became the District Vice President of Sales for Cincinnati and Plaintiff's supervisor (Id.). From June 2001 to March 2004, MARs continued to sell Ceridian's products and services to existing customers (Id.).  Then, in March 2004, Chris Renda became the District Vice President of Sales for Cincinnati and Plaintiff's supervisor (Id.).  At this time, MARs began to sell Ceridian's products and services to new customers exclusively (Id.).  Also in March 2004, Plaintiff turned 40 years old (Id.).

Ceridian's Cincinnati Office was responsible for five regional territories in southern Ohio, southern Indiana, and northern Kentucky (Id.).  Plaintiff was originally assigned territory in the western portion of northern Kentucky known to be

2

the most difficult territory for which the Cincinnati Office was responsible (doc. 16). Ceridian had been unsuccessful in this territory for years before it assigned Plaintiff to it (Id.). Plaintiff obtained the assignment before Renda became the District Vice President in 2004 (doc. 15). After Renda joined the company, Plaintiff told Renda that he thought Ceridian would improve and "turn the tables on [their competitor]" in his territory shortly (doc. 16). In 2005, the Cincinnati office took on more territory, and Defendant expanded Plaintiff's assignment to include territory in Greater Cincinnati (doc. 15).

The sales quota requirement for each MAR varied based on salary level, tenure and position with the company, and the District Office's sales quota requirement (Id.). Plaintiff's sales quota requirement in 2004 and 2005 was 650,000 sales order value (hereinafter "SOV'), which is measured by the dollar value of a sale (Id.). SOV is calculated on a year-to-date basis, whereby the annual SOV is divided by twelve, and on annual basis (Id.). In 2003, Plaintiff attained 84% of his annual sales quota requirement (doc. 16). Plaintiff's performance fell in 2004 and 2005 (doc. 15). In 2004, Plaintiff attained 56.8% of his annual sales quota requirement (Id.). By July 2005, when Plaintiff was terminated by Ceridian, he had failed to satisfy his monthly sales quota requirements for that year (Id.). Specifically, Plaintiff had attained 41.5% of his monthly quota for January, 20.7% for

3

February, 13.8% for March, 18.2% for April, 14.5% for May, 11% for June, and 3% for July (Id.).  Nonetheless, Renda admitted that Plaintiff worked diligently to attain his sales quota requirements as reflected by high levels of "prospecting" and "sales activity" (doc. 15).

Under company policy, MARs who failed to satisfy their mandatory sales quota requirements could be placed on a success plan, which sets forth sales expectations, a deadline for meeting expectations, and consequences if expectations were not met (Id.). If expectations were not met, a MAR could be placed on a performance improvement plan ("PIP") or terminated (Id.).  A PIP also sets forth sales expectations, a deadline for meeting expectations, and consequences if expectations were not met (Id.). If expectations were not met, a MAR could be terminated (Id.).  The District Vice President of Sales can place a MAR on a success plan or a PIP, or terminate a MAR, upon approval from the Human Resources Representative and the Regional Vice President of Sales (Id.).

Shortly after Renda accepted the position of District Vice President of Sales in March 2004, he issued a memorandum to MARs stating that they were expected to attain 100% of their sales quota requirements (Id.).  During his interview, Renda was told that he was expected to improve the Cincinnati Office's performance (Id.).  In April 2004, Renda placed Plaintiff's co-worker Jeff

4

Emmel on a success plan (Id.). Emmel had attained 0% of his annual sales quota requirement (Id.). When Emmel's performance did not improve, Renda terminated him in July 2004 (Id.). Then in October 2004, Renda placed Plaintiff on a success plan (Id.). By that point, Plaintiff had attained 52% of his annual sales quota requirement whereas his co-workers had attained between 84% and 129% of their annual sales quota requirements (Id.). Plaintiff's performance improved (Id.). He attained 212% of his monthly sales quota requirement for October and missed his monthly sales quota requirements for November and December by 2.5% and 5.7% respectively (Id.). In the first part of 2005, however, Plaintiff again underperformed (Id.). By May 2005, Renda placed Plaintiff on a second success plan for attaining only 18% of his annual sales quota requirement (Id.). Also in May 2005, Renda placed Plaintiff's co-worker Kevin McNeal on a success plan for attaining only 8% of his annual sales quota requirement (Id.).

According to Plaintiff, while Renda was District Vice President of Sales, Plaintiff received less support than younger MARs (doc. 16). Specifically, Renda did not perform a competency assessment review with Plaintiff as he did with younger MARs, skipped meetings with Plaintiff more often than he did with younger MARs, withheld training from Plaintiff that he offered to younger MARs, and gave Plaintiff less sales opportunities than he did younger MARs (Id.). Plaintiff also stated that Renda would not

place younger MARs on success plans unless their performance was at "rock-bottom" (Id.).

On May 8, 2005, Plaintiff sent a memorandum to Gina Coded, a Human Resources Representative with Ceridian, and John Whiner, the Regional Vice President, alleging unfair treatment (Id.). The memorandum did not mention age discrimination (Id.). On May 16, 2005, at Coded and Whiner's instruction, Plaintiff submitted a formal complaint to Calvin Scott, the diversity resources ombudsman with Ceridian, that did mention age discrimination as one basis for the alleged unfair treatment (Id.). Plaintiff was the oldest MAR in Ceridian's Cincinnati Office (Id.). When Plaintiff filed the complaint, his co-workers were all between 33 and 35 years old (Id.). In the complaint, Plaintiff claimed that Renda had made four comments regarding his preference for young employees (Id.). Specifically, Plaintiff claimed that Renda's statements included the following: (1) describing a "young" job applicant as "hungry" and saying "I like young, hungry salespeople," (2) commenting favorably on a 24-year-old job applicant and noting that the Atlanta Office had done well with young salespeople, (3) saying that one job applicant was "younger and has a lot more energy" than another applicant that was Plaintiff's age, and (4) when participating in an office pool where employees were assigned contestants from the television show "Survivor," saying "Why do I always get the old guys? I always get

6

screwed" when he was assigned an older contestant (doc. 16). The complaint also expressed Plaintiff's dissatisfaction with the division of sales territories and accounts, the splitting of commissions, and with his former supervisor Steve Collins (doc. 15).

On June 7, 2005, Renda placed Plaintiff on a PIP because Plaintiff did not meet expectations established in his second success plan (Id.). Coded and Whiner approved placing Plaintiff on a PIP (Id.). Plaintiff never asked Renda to lower his mandatory sales quota requirement or to assign him to a different territory (Id.). About this time, McNeal resigned his position with Ceridian, having also failed to meet expectations established in his success plan (Id.).

On June 17, 2005, Plaintiff's complaint and Renda's responses were forwarded to Deanna Shepard, Senior Vice President of Sales, who was the neutral party assigned to evaluate the claims (Id.). Shepard investigated the allegations and interviewed the parties before finding in Renda's favor (Id.). On July 20, 2005, Plaintiff was informed of her decision (Id.). At that time, Plaintiff had failed to meet expectations established in his PIP, attaining 11% of his monthly sales quota requirement for June and 3% for the first part of July (Id.). On July 22, 2005, Renda terminated Plaintiff (Id.). Coded and Whiner approved the termination (Id.).

7

Shortly thereafter, Ceridian reorganized the sales department, reducing the number of territories from five to four (Id.). With McNeal's resignation and Plaintiff's termination, Ceridian needed to hire only one MAR to cover the fourth territory (Id.). In August 2005, Ceridian hired twenty-nine year old Jason Glass (doc. 16). Defendant assigned Glass Plaintiff's disfavored territory in western Kentucky (doc. 15). Tony Arnold, who had been employed as an MAR with Ceridian since before Renda joined the company, was assigned Plaintiff's territory in Greater Cincinnati (Id.).

Through 2005 and the first part of 2006, Defendant's Cincinnati office failed to attain its sales quota requirements (Id.). On May 10, 2006, Renda placed Arnold on a success plan for attaining less than 1% of his annual sales quota requirement (Id.). Also on May 10, 2006, Whiner placed Renda on a PIP (Id.) Both Arnold and Renda failed to meet expectations and resigned on May 26, 2006 and July 3, 2006 respectively (Id.).

On May 30, 2006, Plaintiff filed the Complaint in this matter, alleging Defendant terminated him in violation of the Age Discrimination in Employment Act (ADEA) and in retaliation for his opposition to the discrimination (doc. 1). On June 1, 2007, Ceridian moved for summary judgment (doc. 15). Plaintiff subsequently voluntarily dismissed his retaliation claim (doc. 16), such that the discrimination claim is the only remaining claim

before this Court.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©.  See also, e.g., Osborn v. Ashland County Bd. of Alcohol, Drug Addiction, and Mental Health Servs., 979 F.2d 1131, 1133 (6th Cir. 1992) (per curiam).  In reviewing the instant motion, this Court "must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Patton v. Bearden, 8 F.3d 343, 346 (6th Cir. 1993), quoting in part Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-252 (1986).

The process of moving for summary judgment and the respective burdens it imposes upon the movant and non-movant are well-settled.  First, the movant bears the burden of identifying the portion of the record that demonstrates the absence of a genuine issue of material fact. Celotext Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The movant may do so by merely identifying that the non-moving party has no evidence to support an essential element of its case. See Barnhart v. Pickrel, Schaeffer, & Eheling Co., L.P.A., 12 F.3d 1382, 1389 (6th Cir. 1993).

9

If the movant satisfies its requirement, the non-movant must then submit evidence establishing that a material fact exists that supports an essential element of any claim or defense at issue in which it bears the burden of proof at trial, even if the movant has not submitted evidence negating the existence of that material fact. See Celotex, 477 U.S. at 324. The non-movant must submit more than a mere "scintilla of evidence" to establish that a factual dispute exists. Anderson, 477 U.S. at 252. Furthermore, the factual dispute must involve a material fact: a factual dispute as to an ancillary fact "will not defeat an otherwise properly supported motion for summary judgment." Id. at 247-248. Accordingly, the non-movant must submit "significant probative evidence" demonstrating that "there is [more than] some metaphysical doubt as to the material facts" to survive a motion for summary judgment and proceed to trial on the merits. Moore v. Phillip Morris Cos., Inc., 8 F.3d 335, 339-340 (6th Cir. 1993). However, the Court must view all evidence, facts, and reasonable inferences in the light most favorable to the non-movant. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

If the non-moving party satisfies its requirement, the burden shifts back to the movant, who ultimately must demonstrate that no material facts are in dispute in order to succeed on a motion for summary judgment. See Id. at 587. The district court may

not weigh evidence or assess the credibility of witnesses in deciding the motion. <u>See</u> <u>Adams v. Metiva</u>, 31 F.3d 375, 378 (6th Cir. 1994).

## III.   DISCUSSION

The ADEA prohibits an employer from terminating or otherwise discriminating against an employee on the basis of age. 29 U.S.C. § 623(a)(1).   To determine whether an employer discriminated against an employee, this Court employs a three-part, burden shifting analysis: (1) the plaintiff must establish a <u>prima facie</u> case of discrimination; after which (2) the defendant must articulate a legitimate, non-discriminatory reason for the employment decision; and (3) then plaintiff must show that the defendant's reason is merely a pretext for the decision. <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 801-804 (1973).

The plaintiff may establish a <u>prima</u> <u>facie</u> case of discrimination by presenting either direct or indirect evidence. <u>Allen v. Ethicon, Inc.</u>, 919 F. Supp. 1093, 1098 (S.D. Ohio 1996). In many cases, evidence of direct discrimination can be difficult to produce, so the law allows the plaintiff to raise an inference of discrimination through circumstantial evidence. <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802.  Circumstantial evidence "is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." <u>Wexler v. White's Fine Furniture, Inc.</u>,

11

317 F.3d 564, 570 (6th Cir. 2003).

To establish a _prima_ _facie_ case by circumstantial evidence, the plaintiff must show : (1) he is age forty or older; (2) he was subject to an adverse employment decision; (3) he was qualified for his position; and (4) he was replaced by someone outside the class. Policastro v. Northwest Airlines, Inc., 297 F.3d 535, 538-539 (6th Cir. 2002). The plaintiff may also satisfy the fourth prong by showing that a comparable non-protected person was treated better than the plaintiff. Mitchell v. Toledo Hosp., 964 F.2d 577, 582-583 (6th Cir. 1992). A _prima_ _facie_ case under the four-prong McDonnell Douglas test "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. Furnco Construction Corp v. Waters, 438 U.S. 567, 577 (1978).

Ceridian first argues that Renda's four comments regarding his preference for younger employees do not constitute direct evidence of age discrimination (doc. 15). Ceridian asserts that Renda's comments were ambiguous and that isolated, ambiguous comments do not constitute direct evidence (Id. citing Sullivan v. Delphi Auto Sys. Corp., 198 F. Supp. 2d 952, 959 (S.D. Ohio 2002)). Ceridian also asserts that Renda's comments do not constitute direct evidence because they were neither about Plaintiff nor directed to Plaintiff and because they were not related to the

12

decision to terminate Plaintiff (Id. citing Wilson v. Wells Aluminum Corp., 1997 U.S. App. LEXIS 2331 (6th Cir. 1997); Phelps v. Yale Security, Inc., 986 F.2d 1020 (6th Cir. 1993). Ceridian thus argues that Renda's comments "do not demonstrate evidence of a discriminatory animus" toward Plaintiff and, therefore, Plaintiff "cannot prove age discrimination by direct evidence" (Id.).

Ceridian next argues that Plaintiff cannot establish a prima facie case of age discrimination through indirect evidence because he cannot satisfy the fourth prong of the McDonnell Douglas test (Id.). Ceridian asserts that Plaintiff was not replaced by twenty-nine year old Glass (Id.). According to Defendant, it reorganized the sales department to reduce the number of MARs from five to four (Id.). With McNeal's resignation and Plaintiff's termination, Renda filled only one empty MAR position (Id.). Also, Renda redistributed Plaintiff's territory between Arnold, an existing employee, and Glass, a new employee (Id.). According to Ceridian, these facts indicate that Plaintiff's job and territory were not given to Glass and, therefore, Plaintiff was not replaced by Glass (Id. citing Williams v. Tyco Electric Corp., 161 Fed. Appx. 526, 534-535 (6th Cir. 2006)); Simpson v. Midland-Ross Corp., 823 F.2d 937, 941 n.4 (6th Cir. 1987)). Ceridian also asserts that similarly situated, non-protected employees were not treated more favorably than Plaintiff (Id.). Ceridian supports its assertion by demonstrating that other underperforming MARs were also placed on

success plans and, if their performance did not improve, either resigned or were also terminated (Id.).[1]

Ceridian further argues that Plaintiff's alleged unfair treatment was not based on age (Id.). Ceridian signals that Plaintiff's formal complaint stated that McNeal was treated more favorably than all MARs, not just MARs over forty (Id.). In addition, Plaintiff's formal complaint stated that Collins, Plaintiff's supervisor before Renda joined the Cincinnati Office, had treated Plaintiff unfairly before Plaintiff turned forty years old (Id.).

In response, Plaintiff does not challenge Ceridian's argument that Renda's comments do not constitute direct evidence of age discrimination (doc. 16). In fact, Plaintiff does not argue that any of the evidence constitutes direct evidence of age discrimination (Id.). Instead, Plaintiff argues that he has established a prima facie case of age discrimination under the four-prong McDonnell Douglas test (doc. 16). Plaintiff asserts that the first three prongs of the test are undisputedly established (Id.). Plaintiff further asserts that he was replaced by Glass because Glass was hired one month after Plaintiff was

---

[1] Ceridian provides the following information:
1) April 2004 – Jeff Emmel (33 years old) placed on success plan. Emmel did not improve and was terminated in July 2004.
2) May 2005 – Kevin McNeal (33 years old) placed on success plan. McNeal did not improve and resigned in June 2005.
3) May 2006 – Tony Arnold (36 years old) placed on success plan. Arnold did not improve and resigned in May 2006.

14

terminated, because Glass had the same job title and responsibilities as Plaintiff, and because Glass was assigned nearly all of Plaintiff's former territory (Id.). Plaintiff disputes Ceridian's claim that he was not replaced by Glass because all of his former territory was not assigned to Glass (Id. citing McCrory v. Kraft Food Ingredients, 1996 WL 571146 (6th Cir. 1996)).

Plaintiff also argues that Renda treated younger MARs more favorably than Plaintiff (Id.). Specifically, Plaintiff argues that Renda provided him with less support than younger MARs and that Renda held him to a higher standard than younger MARs (Id.). Furthermore, Plaintiff shows that Renda did not place Arnold on a success plan for failing to attain his annual sales quota requirement in 2005 (Id.). In contrast, Renda placed Plaintiff on a success plan for failing to attain his annual sales quota requirement in 2004 even though Plaintiff's performance was actually slightly better than Arnold's 2005 performance. Thus, argues Plaintiff, when Arnold, who was younger, occupied the same position, and achieved essentially the same results as Plaintiff at the same point in the year, Renda did not treat Arnold the same way he treated Plaintiff in the previous year.

In reply, Ceridian reiterates its argument that Renda's four comments regarding his preference for young employees do not constitute direct evidence of age discrimination (doc. 17). Ceridian asserts that Renda's comments meet only one of the four

factors for determining whether statements constitute age discrimination: that the statement was made by a decision-maker or an agent within the scope of his employment (Id. citing Peters v. The Lincoln Electric Company, 285 F.3d 456, 478 (6th Cir. 2002) (citing Cooley v. Carmike Cinemas, Inc., 25 F.3d 1325, 1330 (6th Cir. 1994))). Ceridian asserts that Renda's comments do not meet the other three factors: that they were related to the decision making process; they were more than merely vague, ambiguous, or isolated comments; and that they were made proximate in time to the adverse employment decision (Id.). In addition, Ceridian asserts that Renda was not the "sole decisionmaker responsible for Plaintiff's termination" since he did not assign territories or quotas and since he simply recommended to his own supervisors that Plaintiff be terminated (Id.) Thus, Ceridian argues that Plaintiff has no direct evidence of age discrimination (Id.).

Ceridian also reiterates its argument that Plaintiff was not replaced by Glass (Id.). Ceridian asserts that Plaintiff's former responsibilities and territory were divided among two MARs who had additional responsibilities and territory for which Plaintiff had not been responsible (Id.). According to Ceridian, this demonstrates that Plaintiff was not replaced by Glass (Id. citing Williams, 161 Fed. Appx. at 534-535 ("Even if those he claims were hired to replace him did in fact fill jobs similar to the one he held before his termination, the undisputed evidence

16

suggests that they were hired, not to fill a position vacated by him, but in response to positions that opened after [plaintiff] had been terminated, created by changed circumstances, that did not exist at the time that he was terminated.")).

Ceridian further argues Renda did not treat similarly situated, non-protected employees better than Plaintiff (Id.). First, Ceridian disputes Plaintiff's claim that he received less support than younger MARs (Id.). Ceridian argues Plaintiff's claim is based on his own "unsupported conjecture, suspicions, and beliefs" and that the only evidence that Plaintiff received less support than younger MARs is his statements in his own Affidavit (Id.). Ceridian asserts, and Plaintiff admits, that Renda had weekly meetings with Plaintiff, that Renda routinely accompanied Plaintiff on sales calls, that in September 2004 Renda assisted Plaintiff in closing a sale, that in October 2004 Renda traveled with Plaintiff to attend meetings between Plaintiff and a client (Id.). Ceridian also asserts that, even if Renda did provide more support to other MARs by performing competency assessment reviews and offering training, Plaintiff cannot satisfy this prong of the McDonnell Douglas test because he cannot prove that Renda provided more support to every similarly situated, non-protected MAR (Id.).

Second, Ceridian disputes Plaintiff's claim that Renda held Plaintiff to a higher standard than younger MARs (Id.). Ceridian argues that Plaintiff's coworkers - specifically Emmel,

17

McNeal, and Arnold - were not similarly situated to Plaintiff. (Id. citing Marshall v. Federal Express Corp., 12 Fed. Appx. 186 (6th Cir. 2000)). Ceridian supports its argument by showing that Emmel's poor performance and Ceridian's failure to discipline him for such occurred before Renda joined the Cincinnati Office (Id.). Once Renda joined the Cincinnati Office, he placed Emmel on a success plan within one month and terminated him three months later (Id.). Ceridian further supports its argument by showing that Renda considered past and present performance when disciplining MARs and that, unlike Plaintiff, McNeal and Arnold had successful past performances (Id.). Ceridian focuses on the fact that McNeal and Arnold had exceeded 100% of their annual sales quota requirements for 2003 and their year-to-date sales quota requirements by October 2004 whereas Plaintiff fell below both sales quota requirements (Id.). When Renda placed McNeal on a success plan in May 2005, McNeal had exceeded his annual sales quota requirement for 2003 but had then fallen short of his annual sales quota requirement for 2004 and attained only eight percent of his year-to-date sales quota requirement in the first four months of 2005 (Id). When Renda placed Arnold on a success plan in May 2006, Arnold had exceeded his annual sales quota requirement for 2003 and 2004 but had then fallen short of his annual sales quota requirement for 2005 and attained less than 1% of his year-to-date sales quota requirement in the first four months of 2006 (Id.).

18

According to Ceridian, Renda did not treat Emmel, McNeal, or Arnold more favorably than Plaintiff (Id.).  Ceridian supports its argument by demonstrating that Renda terminated Emmel when Emmel had been placed on only one success plan but did not terminate Plaintiff until Plaintiff had been placed on two success plans and a PIP (Id.)  Ceridian further argues that when Renda placed Plaintiff on a success plan in October 2004, Plaintiff had fallen short of his annual sales quota requirement for 2003 and attained only fifty-two percent of his year-to-date sales quota requirement in the first nine months of 2004 (Id.).  Further, Ceridian points out that McNeal and Arnold resigned after receiving their success plans, which meant that Renda was never in the position to place them on a second success plan or a PIP or to terminate them as with Plaintiff (Id.).

In addition to arguing that Plaintiff's poor performance constituted a legitimate, non-discriminatory reason for terminating Plaintiff, Defendant argues that Plaintiff cannot rebut such reason as pretext (doc. 15).  Defendant argues it acted within its rights to terminate an underperforming employee, and that Renda's age-related comments were not directed at Plaintiff (Id.).

Plaintiff argues the sheer weight of the circumstantial evidence proves that Defendant's proffered reason for his termination was not the true motivation for Defendant's decision (doc. 16).  In Plaintiff's view, a reasonable jury could find that

19

Plaintiff's level of quota attainment was insufficient to motivate the decision to fire him, as younger people were not held to the same standards (Id.). Plaintiff further argues that Renda's ageist statements are further evidence of bias, and can be used to show pretext (Id. citing Carter v. University of Toledo, 349 F.3d 269, 275-76 (6th Cir. 2003)).

## IV. Discussion

Plaintiff concedes in its Response that Renda's age-related remarks do not constitute direct evidence of age discrimination, but argues that such comments still serve as strong circumstantial evidence of age-related bias. The Court agrees, and will confine its analysis, therefore, to the McDonnell Douglas test for circumstantial evidence of age discrimination.

Having reviewed this matter, the Court finds sufficient circumstantial evidence to support Plaintiff's prima facie case. Clearly, Plaintiff was over forty and suffered an adverse employment decision. A reasonable jury could find that Plaintiff was qualified for his position based on his seventeen years of experience with Ceridian, his promotion to the position of MAR, the fact that he was assigned to a difficult sales territory in which Ceridian had been unsuccessful for years, the fact that he was never disciplined until Renda joined the Cincinnati Office, and Renda's admission that Plaintiff was a hard worker who was knowledgeable about Ceridian's products and was always prepared for

20

sales meetings.

Although Ceridian repeatedly disputes Plaintiff's claim that he can satisfy the fourth prong of the McDonnell Douglas test, a reasonable jury could find evidence that Plaintiff was replaced by Glass, or that Plaintiff was treated less favorably than younger MARs, or both. The Court finds, therefore, that Plaintiff has raised genuine issues of material fact as to the fourth prong of the test. First, a reasonable jury could infer that Plaintiff was replaced by twenty-nine year old Glass from the facts that Defendant hired Glass one month after Plaintiff was terminated, Glass had the same job title and responsibilities as Plaintiff, and Glass was assigned nearly all of Plaintiff's former territory, despite the fact that the sales department was reorganized at that time. Contrary to Ceridian's assertion, the sales department's reorganization does not preclude a jury from finding that Plaintiff was replaced by Glass, whose position was nearly identical in all relevant respects. Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 804 (6th Cir. 1994).

Second, a reasonable jury could conclude that Plaintiff was treated less favorably than similarly situated, non-protected employees based on the statistics provided by Plaintiff regarding his sales record when he was disciplined compared with the records of younger MARs when they were disciplined. Similarly, a jury could find that Renda gave Plaintiff a different level of support

21

than Renda gave the younger MARs.  A jury could also reasonably conclude that Plaintiff was similarly situated to Emmel, McNeal, and Arnold based on the facts that all four men had the same job title and responsibilities.  The Court is unconvinced by Ceridian's argument that Emmel, McNeal, and Arnold were not similarly situated to Plaintiff based on the timing of Emmel's success plan and termination, and McNeal and Arnold's successful past performance. For all of the above reasons, the Court concludes that a reasonable jury could find that Plaintiff has established a prima facie case of age discrimination.

Plaintiff has the burden of showing that a reasonable jury could find that Ceridian's explanation for his termination is merely a pretext.  The Court finds Plaintiff has done so by showing that Renda did not discipline younger MARS until their performance was well below Plaintiff's performance.  Plaintiff has shown that when Renda placed McNeal and Arnold on their success plans they had attained respectively eight percent and less than one percent of their year-to-date sales quota requirements.  In contrast, Renda placed Plaintiff on his first success plan when he had attained fifty-two percent of his year-to-date sales quota requirement.  The Court is not persuaded by Ceridian's argument that Plaintiff cannot show pretext based on the facts that younger MARs, and specifically Arnold, were not similarly situated to Plaintiff and were not disciplined as quickly as Plaintiff due to their successful past

22

performances.    Renda's argument that he disciplined Plaintiff simply because he was underperforming is undermined by the fact that he waited so long to discipline McNeal and Arnold.  Once Renda joined the Office in March 2004, he allowed Plaintiff to underperform for six months before placing him on a success plan in October 2004. However, Renda allowed McNeal to underperform for thirteen months before placing him on a success plan and allowed Arnold to underperform for sixteen months before placing him on a success plan.   For all these reasons, the Court concludes Plaintiff's age discrimination claim withstands Defendant's Motion for Summary Judgment.

## V.  Conclusion

Having reviewed this matter, and viewing all the evidence, facts, and reasonable inferences in a light most favorably to Plaintiff, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), the Court does not find well-taken Defendant's Motion for Summary Judgment.  Plaintiff has shown that there are genuine issues of material fact as to whether Plaintiff was treated differently from similarly-situated non-protected employees, and thus has established a prima facie case of age discrimination.   Moreover, Plaintiff has similarly shown that a jury could reasonably find pretextual Defendant's proffered reasons for Plaintiff's termination, based on both the disparate treatment and strong circumstantial evidence of age-related bias in comments

made by Renda.    Accordingly, the Court DENIES Defendant's Motion

for  Summary  Judgment  (doc.  15),  RESETS  the  final  pretrial

conference for 2:00 P.M. on April 24, 2008, and schedules on deck

the  three-day jury trial for May 20, 2008.


          SO ORDERED.


Dated: February 5, 2008          /s/ S.  Arthur Spiegel
                                 S. Arthur Spiegel
                                 United States Senior District Judge


24